

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| IN THE MATTER OF THE PETITION OF MISSOURI-AMERICAN WATER COMPANY FOR APPROVAL TO CHANGE AN INFRASTRUCTURE SYSTEM REPLACEMENT SURCHARGE, | ) ) ) ) ) ) ) |
| | WD83067 |
| | OPINION FILED: April 21, 2020 |
| Appellant, | ) ) ) |
| v. | ) ) |
| MISSOURI PUBLIC SERVICE COMMISSION, | ) ) ) |
| Respondent. | ) ) |

**Appeal from the Public Service Commission**

Before Division One: Lisa White Hardwick, Presiding Judge, Cynthia L. Martin, Judge
and Thomas N. Chapman, Judge

Missouri-American Water Company ("Missouri-American" or "the company")

appeals from the Public Service Commission's ("Commission") report and order approving

Missouri American's petition to change the company's infrastructure system replacement

surcharge ("ISRS") to recover costs the company incurred in connection with infrastructure

system replacements and relocations made from October 1, 2018, to March 31, 2019.

Missouri-American asserts two points on appeal, both related to the Commission's exclusion of estimated net operating loss from calculation of the ISRS. Finding no error, we affirm.

## Regulatory and Procedural Background

Missouri-American is a "water corporation" and a "public utility," as defined by sections 386.020(59) and (43), and 393.1000(7).[1] The company is wholly owned by its parent company, American Water Works. Missouri-American provides water service to approximately 468,000 customers in Missouri, including the majority of St. Louis County. Missouri-American is subject to the jurisdiction of the Commission as provided in Chapters 386 and 393. The Commission is a creature of statute, created by the General Assembly to regulate public utilities, including water corporations, in Missouri. *See* section 386.040; section 386.250(3).

The General Assembly created ISRS to permit water corporations to recover costs associated with eligible infrastructure system replacements outside a general ratemaking case. *See* section 393.1003; section 393.1006.

> [A]n approved ISRS can be collected only for three years at the most, at which point it then terminates (unless a new rate case is pending). Thereafter, the [utility] has to file revised rate schedules to reset the ISRS to zero upon resolution of a general rate case. [Section 393.1006.6(1)]. The [utility] may then seek to establish a new ISRS by filing a petition pursuant to section [393.1003].
>
> Collectively, the ISRS statutes permit the [utility] to make single-issue rate increases between general rate cases in order to timely recover its costs for certain government-mandated infrastructure projects without the time and expense required to prepare and file a general rate case, while, at the same

---

[1]All statutory references are to RSMo 2016, as supplemented through February 20, 2019, the date Missouri-American filed its petition to change its ISRS, unless otherwise indicated.

time, limiting the collection of the ISRS surcharge to three years to prevent its unlimited use outside of a general rate case.

*Mo.-Am. Water Co. v. Pub. Serv. Comm'n*, 591 S.W.3d 465, 468 (Mo. App. W.D. 2019) (quoting *In re Laclede Gas Co.*, 417 S.W.3d 815, 821-22 (Mo. App. W.D. 2014)).

Missouri-American's most recent general rate case, WR-2017-0285, resulted in a rate that took effect in May 2018 ("2017 general rate case"). The Commission thereafter approved Missouri-American's request for an ISRS, Case No. WO-2018-0373, to recover eligible costs incurred in connection with infrastructure system replacements and relocations made from January 1, 2018, to September 30, 2018, in the amount of $6,377,959. Missouri-American appealed, contesting the amount of the approved ISRS. The Commission's report and order setting this ISRS was affirmed in *Missouri-American Water Co. v. Public Service Commission* (*Missouri-American I*), 591 S.W.3d 465 (Mo. App. W.D. 2019).

On February 20, 2019, Missouri-American filed a petition to change its ISRS ("petition") to recover eligible costs incurred in connection with infrastructure system replacements and relocations made from October 1, 2018, to March 31, 2019 ("ISRS period"), for its St. Louis County service territory.[2] Missouri-American's petition proposed a rate schedule that, if adopted, would have produced ISRS revenues of $8,405,079 on an annualized basis, an increase of 4.1% on the base revenue established in the 2017 general rate case. In its petition, Missouri-American noted that its prior ISRS case (Case No. WO-2018-0373) "concerned an issue related to a potential tax normalization violation," and

---

[2]Section 393.1003.1 only allows a water corporation to seek an ISRS if it provides "water service in a county with a charter form of government and with more than one million inhabitants."

3

advised the Commission that Missouri-American had informed the Internal Revenue Service ("IRS") of that potential violation. The petition further indicated that Missouri-American was in the process of formally requesting a private letter ruling from the IRS on "this issue as it relates to treatment of deferred taxes in an ISRS case."

Missouri-American attached documentation to its petition which identified "the type of additions, utility account, work order description, addition amount, depreciation rate, accumulated depreciation, and depreciation expense" for those infrastructure replacements and improvements made from October 2018 to January 2019. Missouri-American also provided estimates for those projects set to be completed through March 31, 2019. Those estimates were eventually replaced with actual cost information, which resulted in an increase in the requested ISRS to produce revenues of $9,707,229.

The documents Missouri-American filed in support of its petition included a calculation for accumulated deferred income taxes ("ADIT"), which is the difference between what is being paid by customers attributable to Missouri-American's tax liability, and the amount actually being paid by Missouri-American for taxes given the effect of accelerated depreciation. The normalization method anticipates that the ADIT will be retained by the company rather than passed on to customer's immediately in the form of a rate reduction. In calculating the ADIT, Missouri-American included an estimated net operating loss ("NOL") of $8,764,652 for the ISRS period. Missouri-American calculated this ISRS NOL by subtracting expenditures during the ISRS period for eligible infrastructure replacements and improvements (including related accelerated depreciation)

4

from zero ISRS revenue it would be collecting from these eligible expenditures during the ISRS period.[3]

The Commission directed the Commission Staff ("PSC Staff")[4] to review Missouri-American's petition and to submit a report and recommendation to the Commission no later than April 22, 2019, in accordance with section 393.1006.2(2). The PSC Staff proposed corrections and adjustments to Missouri-American's proposed ISRS ("PSC Staff recommendation" or "its recommendation") that reduced the requested ISRS to $8,878,845. One adjustment involved removing NOL from Missouri-American's calculation of the ADIT because it was the PSC Staff's "understanding . . . that no amount of [NOL] has actually been generated for income tax purposes by [Missouri-American] on an aggregate basis since October 1, 2018," and because the PSC Staff "[had] not been presented with any evidence that imputation of a 'hypothetical' NOL amount into ISRS rate base in this case is required to comply with the normalization provisions of the [IRS] Code."

Missouri-American filed a response disagreeing with the PSC Staff's recommendation on April 26, 2019. Missouri-American objected to the PSC Staff's removal of NOL from the ADIT calculation. Missouri-American did not object to other

---

[3]Missouri-American's NOL calculation attributed zero revenue during the ISRS period on the theory that the ISRS expenditures would not generate revenue until after the ISRS period because they would not yet be in place.

[4]"The Commission employs technical experts . . . who are responsible for representing the Commission and State of Missouri in all Commission investigations, contested cases, and other proceedings unless PSC Staff timely files a notice of its intention not to participate in a proceeding." *Laclede Gas Co. v. Office of Pub. Counsel*, 523 S.W.3d 27, 29-30 (Mo. App. W.D. 2017).

adjustments the PSC Staff made to the calculation of the appropriate amount of ISRS revenues.

The Commission held an evidentiary hearing on May 17, 2019, admitting the testimony of six witnesses and thirteen exhibits into evidence. After reviewing the evidence submitted, the Commission issued its report and order ("Report and Order") on June 5, 2019, with an effective date of June 15, 2019. The Commission recognized that the only issues over which Missouri-American and the PSC Staff disagreed were whether an NOL attributable to the ISRS period should be included in the ADIT, and if so, what impact the NOL has on the ISRS amount. The Report and Order noted that the Commission's earlier report and order in Case No. WO-2018-0373, which had approved, in part, Missouri-American's first ISRS request, involved similar issues and was still pending before the Missouri Court of Appeals.

The Report and Order made the following findings of fact: (1) "NOL is a tax return adjustment and not a regulatory item"; (2) NOL is defined as "the excess of operating expenses over revenues," and it "results when a utility does not have enough taxable income to utilize all of the tax deductions to which it would otherwise be entitled"; (3) any unused NOL may be carried forward from year to year to offset taxable income; (4) "[Missouri-American has had] a federal income tax NOL carryover . . . from years prior to the ISRS Period," but that "NOL carryover [had] been decreasing over time since the start of 2018, and [was] expected to continue to decline through 2019 with the exception of a few months," and "no net amount of NOL has actually been generated for federal income tax purposes by [Missouri-American] *on an aggregate basis* since January 1, 2018"; (5)

6

Missouri-American calculated the assumed NOL during the ISRS period by subtracting depreciation, accelerated depreciation, repairs deduction, and interest expense from zero revenue generated by the ISRS replacements and improvements in order to create a NOL specifically associated with ISRS replacements and improvements; (6) the NOL assumed by Missouri-American for the ISRS period does not yet exist because Missouri-American had not yet filed its tax returns for 2018 and 2019 and did not expect to do so until October 2019 and October 2020, respectively; (7) Missouri-American expected to have taxable income in 2018 and 2019; (8) "NOL's are calculated on an overall basis" and "are not split out for accounting purposes by various tax deductions that may contribute to an NOL situation"; (9) "[Missouri-American] project[ed] that it [would] be able to reflect all of its net accelerated depreciation benefits associated with ISRS plant additions on its books during the [following] two years without the need to record any new offsetting NOL amount"; and (10) Missouri-American's NOL as of December 31, 2017, was reflected in its last general rate case.

The Commission's Report and Order then concluded that Missouri-American failed to meet its burden to prove by a preponderance of the evidence that an NOL would in fact be generated during the ISRS period. Specifically, the Report and Order concluded, "Without supporting tax documentation and without supporting evidence in the utility's books, the Commission cannot determine if an NOL will, or does, exist based on estimates." The Commission noted that, because Missouri-American is expected to have taxable income in 2018 and 2019, it was reasonable to conclude that Missouri-American would not be generating an NOL during the ISRS period. Further, the Report and Order

7

concluded that "NOLs are not specifically tracked as to origin," so that a company's NOL should ordinarily be addressed in a full general rate cases as was the case in Missouri-American's 2017 general rate case.

The Report and Order adopted the PSC Staff's rate design, authorizing Missouri-American to establish an ISRS in the amount of $8,878,845. The Report and Order directed Missouri-American to file notice with the Commission within ten days of issuance of any conclusion or statement by the IRS regarding Missouri-American's self-report of possible violation of normalization rules, and regarding any requested private letter rulings.

On June 11, 2019, Missouri-American filed a notice with the Commission, informing it that the company had submitted, on June 5, 2019 and June 6, 2019, requests for private letter rulings from the IRS regarding the scope of the deferred tax normalization requirements and the correct methodology for reducing the ADIT balance when a NOL carryforward exists.

Missouri-American filed a timely application for rehearing, which the Commission denied. Missouri-American timely appeals.

## Standard of Review

Section 386.510 mandates that our review of any order entered by the Commission is limited to whether the order is lawful and reasonable. We presume that the Commission's Report and Order is lawful and reasonable, and Missouri-American, as the appellant, has the burden to prove, by clear and satisfactory evidence, that the Report and Order is either unlawful or unreasonable. *Missouri-American I*, 591 S.W.3d at 469 (citing section 386.430). "The lawfulness of the [Commission's] order is determined by whether statutory

8

authority for its issuance exists, and all legal issues are reviewed *de novo*." *Laclede Gas Co. v. Office of Pub. Counsel*, 523 S.W.3d 27, 32 (Mo. App. W.D. 2017) (quoting *In re Verified Application & Petition of Liberty Energy (Midstates) Corp.*, 464 S.W.3d 520, 524 (Mo. banc 2015)). The reasonableness of the order concerns whether it is "supported by substantial, competent evidence on the whole record and is not arbitrary, capricious, or an abuse of discretion." *Missouri-American I*, 591 S.W.3d at 469. "We consider the evidence, along with all reasonable supporting inferences, in the light most favorable to the Commission's order." *Id.* (quoting *State ex rel. Pub. Counsel v. Mo. Pub. Serv. Comm'n*, 289 S.W.3d 240, 246-47 (Mo. App. W.D. 2009)). But the appellant may not introduce, and we may not consider, new or additional evidence. Section 386.510.

**Analysis**

Missouri-American asserts two points on appeal, both of which concern the Commission's exclusion of the company's estimated NOL in the calculation of the ISRS. We begin with Missouri-American's second point on appeal.

*Point Two: Focusing on the Company as a Whole*

Missouri-American's second point on appeal asserts that the Commission erred in not considering NOL estimated by Missouri-American in the ISRS approved by the Report and Order because, in doing so, the Commission focused on the company as a whole, and not solely on the eligible ISRS costs and revenues, in contravention of section 393.1000. Missouri-American argues that the Commission's conclusions about the company as a whole "are irrelevant to the requirements of the ISRS statute, as well as the Commission's statutory authority to grant an ISRS" because the ISRS statutes, sections 393.1000 through

9

393.1006, limit the Commission's consideration of the "appropriate pretax revenues" to the "eligible infrastructure system replacements" and to the ISRS period. [Appellant's Brief, p. 38] Missouri-American further argues that the Commission ignored evidence that related specifically to the "eligible infrastructure system replacements," particularly the new deductions related to the ISRS period infrastructure investments (including depreciation and interest expense, accelerated depreciation, and repairs) taken against the ISRS revenue (none since the last general rate case).

Missouri-American made an ***identical*** argument in *Missouri-American I*.[5] There, we noted that substantial evidence presented to the Commission supported the Commission's findings that Missouri-American was not expected to generate additional NOL in 2018 and 2019 on an aggregate basis, and that NOL is not asset specific and cannot be tied to a specific infrastructure investment. 591 S.W.3d at 476. We then held:

> The statutory language requires recognition of "accumulated" deferred income taxes. [Missouri-American's] NOL deferred tax asset balance as of year-end 2017 was reflected in [the company's] base rates following the general rate case. [Missouri-American's] evidence showed that no NOL had been generated after that time, nor was any expected to be generated during the January 1, 2018 through September 30, 2018 time frame. [Missouri-American's] proposal to include an NOL amount in the ISRS was based on the theory that the addition of ISRS plant to [its] rate base without immediate receipt of new revenues reduced its taxable income below the level that would result if the ISRS plant addition had not been made. [Missouri-American] claimed this delayed the rate at which [the company] could utilize prior accumulated NOLs as a carry-forward against future taxable income. Yet, direct rate recovery of investment by a utility can only occur after that investment is in service; it must be used and useful. *State ex rel. Union Electric Co. v. Public Service Commission*, 765 S.W.2d 618, 622 (Mo. App. 1988). ***Applying incremental tax deductions associated with***

[5]Missouri-American's second point relied on in this case inserts the word "unreasonable," but otherwise the substance of its argument supporting the point relied on is identical to *Missouri-American I*.

10

*new plant investments to zero incremental revenue creates a hypothetical net operating loss but does not show whether the utility is actually generating an NOL associated with that investment.*

The Commission heard [Missouri-American's] evidence regarding delayed use of prior accumulated NOLs as a result of the plant additions but found the evidence that [Missouri-American] was not generating or booking any actual NOL during the ISRS period most compelling. Because [Missouri-American's] calculations regarding alleged NOLs associated with the specific plant improvements were hypothetical, we cannot agree that the Commission's reliance on actual data from [Missouri-American] which reflects that [the company] as a whole, with the specific plant improvements incorporated into that data, accumulated no NOL during the relevant time period was in error. [Missouri-American] had the burden of proof regarding the amount of deferred income taxes associated with eligible infrastructure system replacements being accumulated during the relevant time period.

The Commission's order which evaluated [Missouri-American's] total NOL data in reaching the conclusion that no NOL was accumulated during the ISRS Period was not unlawful. Deferred income taxes and depreciation associated with eligible infrastructure system replacements were not excluded from the ISRS computation. [Missouri-American's] second point on appeal is denied.

*Id.* at 477 (emphasis added).

The same analysis applies here. Missouri-American does not dispute the Commission's finding that "[a]n NOL is a tax return adjustment and not a regulatory item," and that there was evidence before the Commission that NOL is not asset specific. The Commission had before it evidence that, in Missouri-American's last general rate case, the Commission took into account the company's NOL as of December 31, 2017, and "under the terms of the stipulation and agreement provided by the Commission in that case, . . . no further rate treatment of ISRS eligible costs, which includes NOL amounts, incurred prior to 2018 [may] be included in subsequent ISRS proceedings." Evidence before the Commission established that, while Missouri-American's NOL carryover balance

11

increased in the months of June, October, and November 2018 and February 2019, the net effect for the entire ISRS period was an overall decrease. An auditor for PSC Staff testified Missouri-American's NOL carryover balance "has been decreasing over time since the start of 2018, and is expected to continue to decline through 2019 with the exception of a few months." The Commission found this evidence compelling, concluding that because "[Missouri-American] is expected to have taxable income in 2018 and 2019, it is reasonable to conclude that [Missouri-American] is not generating an NOL during the ISRS Period." We do not disagree, as "the relevant time period for determining whether an NOL was incurred is the entirety of the ISRS time period, not one month out of the entirety of the time period." *Missouri-American I*, 591 S.W.3d at 470.

Nevertheless, Missouri-American asks us to conclude that the Commission ignored evidence that the company experiences an NOL every time it makes an infrastructure replacement or improvement until the ISRS rate is implemented by the Commission. But, Missouri-American's method for calculating an NOL associated with an ISRS--which subtracts the expenditures that will be incurred for eligible infrastructure replacements and improvements (including related accelerated depreciation) from zero revenue that will be generated from those expenditures during the ISRS period--was expressly rejected in *Missouri-American I*. We reiterate that "direct rate recovery of investment by a utility can only occur *after* that investment is in service." *Missouri-American I*, 591 S.W.3d at 477 (emphasis added) (citing *State ex rel. Union Elec. Co.*, 765 S.W.2d at 622).

Further, just as we concluded in *Missouri-American I*, we cannot fault the Commission for relying "on actual data from [Missouri-American] which reflects that [the

12

company] as a whole . . . during the relevant time period" would not be generating an NOL, while rejecting as irrelevant Missouri-American's hypothetical calculation of an NOL based solely on anticipated expenses for, and revenues from, ISRS improvements and repairs during the ISRS period. *Id.* Missouri-American bore the burden of proof with respect to the appropriate amount of the ADIT to be used in calculating the ISRS rate. *See Matter of Application of Laclede Gas Co. v. Mo. Pub. Serv. Comm'n*, Nos. WD82199 & WD82299, 2019 WL 6119758, at *8 (Mo. App. W.D. Nov. 19, 2019) (citing section 393.150.2). The Commission did not err in concluding that Missouri-American failed to meet its burden.

Point Two is denied.

### *Point One: Failure to Comply with IRS Regulations for Accelerated Depreciation*

Missouri-American's first point on appeal argues that the Commission's Report and Order was unreasonable because by failing to consider NOL as a part of Missouri-American's ISRS request, the Commission failed to act in accordance with IRS regulations addressing accelerated depreciation, resulting in a normalization violation. Missouri-American asserts that "[t]he stakes are significant as violation of the IRS rules at issue could cause the loss of significant tax benefits currently benefitting [Missouri-American's] customers and ultimately, result in higher rates for taxpayers." [Appellant's Brief, p. 18]

We have already held in connection with Mid-American's second point on appeal that the Commission did not err in focusing on the company as a whole to determine whether NOL was incurred during the ISRS period as to be appropriately considered in calculating the ADIT. Missouri-American does not dispute that substantial evidence

13

supports the Commission's finding that the company as a whole will incur no NOL during the ISRS period. Despite this fact, Missouri-American's first point on appeal argues that it is nonetheless unreasonable for the Commission to calculate an ISRS that is inconsistent with the spirit of applicable IRS regulations, and that will result in a normalization violation.

Missouri-American made a similar argument in *Missouri-American I*. There, Missouri-American noted "the potential impact to [the company] and customers of the failure of the Commission to include, pursuant to Section 393.1000, an NOL in its calculations," and asked us "to find that disallowing inclusion of [the company's] proposed NOL is inconsistent with the purpose behind the normalized method of accounting because customers receive the benefit of tax deduction now, through a lower ISRS rate, even though the [c]ompany is unable to benefit from those tax deductions at this time." 591 S.W.3d at 470, 474. We refused the invitation to do so. *Id.* at 474. In doing so, we rejected Missouri-American's reliance on IRS private letter rulings *issued to other utilities*, finding that "[t]he private letter rulings relied upon by [Missouri-American] are not binding precedent and [Missouri-American] does not dispute the Commission's finding that all of the rulings relied upon by [the company] involved situations where NOLs were actually generated, not hypothetically generated." *Id.* We then concluded:

> The real question posed by [Missouri-American] is whether, in enacting normalization rules, Congress intended for zero revenue to be imputed in ISRS computations so that a net operating loss for that investment will result, leading to increased customer rates following ISRS proceedings so as to provide additional cost-free funds to the utility. We cannot answer this question in the affirmative with the record before us. Because it is undisputed that normalization resulted in cost-free investment funds being provided to

14

the utility long before the ISRS application at issue, we cannot say that failure to impute an NOL in this ISRS proceeding thwarts the purpose of normalization. Theoretically, incentive funds previously received by the company are being used for this ISRS investment. Further, through the ISRS process, the utility will still recover costs on the investment even if incentive funds are used to support the investment.

> Collectively, the ISRS statutes permit the gas company [or water company] to make single-issue rate increases between general rate cases in order to timely recover its costs for certain . . . infrastructure projects without the time and expense required to prepare and file a general rate case, while, at the same time, limiting the collection of the ISRS surcharge to three years to prevent its unlimited use outside of a general rate case.

*In re Laclede Gas Co.*, 417 S.W.3d at 821-822. Additionally, "[a]fter the [Commission's] initial approval of an ISRS, the water corporation can file for permission to make periodic adjustments to the ISRS to update the amount of the surcharge being collected." *Agnew v. Missouri-American Water Company*, 567 S.W.3d 652, 656 (Mo. App. 2018) (citing [section] 393.1006.5(2)).

We find the Commission's determination that no NOL was incurred by [Missouri-American] in the relevant 2018 time period was supported by substantial, competent evidence on the whole record and, therefore, reasonable.

*Id.* at 475. Nothing has changed since our decision in *Missouri-American I* to warrant a different conclusion in this case.

Missouri-American refers in its brief to the purported fact that it received a private letter ruling from the IRS on December 3, 2019, less than a month after we issued our decision in *Missouri-American I*, and almost six months after the Commission issued its Report and Order in this case. This purported private letter ruling is not a part of the record on appeal, and was obviously not considered by the Commission.[6] The function of the

---

[6]We assume, but cannot determine from the record properly before us, that the private letter ruling Missouri-American purportedly received was in response to the June 5, 2019 and June 6, 2019 requests for private

15

Commission is to regulate and fix rates or charges for public utilities, and to classify consumers to whom those rates are chargeable. *Evans v. Empire Dist. Elec. Co.*, 346 S.W.3d 313, 317 (Mo. App. W.D. 2011). Our role is limited to reviewing Commission determinations for lawfulness and reasonableness without considering evidence not before the Commission.[7] Section 386.510 ("[N]o new or additional evidence may be introduced in the appellate court . . . .").

Though Missouri-American characterizes as calamitous its inability to capture hypothetically calculated NOL for an ISRS period, based solely on the costs and revenues associated with ISRS replacements and improvements, the fact remains that Missouri-American's concern amounts to nothing more than a timing issue. ***Actual*** financial impact on the company (including impact associated with purported violations of IRS normalization rules) that is supported by substantial evidence, and calculated appropriately, may be eligible for consideration in a future ISRS rate case,[8] or at a minimum will be eligible for consideration in Missouri-American's next general rate case.

Point One is denied.

---

letter rulings about which Missouri-American notified the Commission on June 11, 2019, just before the Commission's Report and Order was scheduled to take effect.

[7]PSC Staff asks us to strike from Missouri-American's brief the attempts to introduce the December 3, 2019 private letter ruling by the IRS. We agree. Since the December 3, 2019 private letter ruling is extraneous to the Commission's record and should not be considered on appeal, we strike those references to the December 3, 2019 private letter ruling from Missouri-American's brief. *See Crestwood Commons Redev. Corp. v. 66 Drive-In, Inc.*, 812 S.W.2d 903, 909 (Mo. App. E.D. 1991) ("Since the presentment of evidence extraneous to the trial court record should not be considered on appeal, we strike these portions.").

[8]A water corporation may "file for permission to make periodic adjustments to the ISRS to update the amount of the surcharge being collected" at any time. *Missouri-American I*, 591 S.W.3d at 475. Section 393.1006.5(2) provides a mechanism to correct the ISRS for over-collection or under-collection of ISRS revenue through an adjustment made by order of the Commission. If adjustments are made, they would remain in place until the next general rate case in which the ISRS will be terminated and absorbed into the company's new general rate. Section 393.1006.6.

16

## Conclusion

The Commission's Report and Order is affirmed.

_____
Cynthia L. Martin, Judge

All concur